**GRAIN PROCESSING CORPORATION, Plaintiff–Appellant,**

v.

**AMERICAN MAIZE–PRODUCTS COMPANY, Defendant–Appellee.**

No. 98–1081.

United States Court of Appeals, Federal Circuit.

Aug. 4, 1999.

can Maize–Products Co., 893 F.Supp. 1386, 1396, 37 USPQ2d 1299, 1307 (N.D.Ind.1995) (*Grain Processing VI* ), rev'd, Nos. 95–1506, 95–1507, 108 F.3d 1392, 1997 WL 71726 (Fed.Cir. Feb.20, 1997) (nonprecedential) (*Grain Processing VII* ).

The district court found that American Maize proved that a noninfringing substitute was available, though not on the market or for sale, during the period of infringement. The court found further that this substitute was acceptable to all purchasers of the infringing product and concluded that American Maize rebutted the inference of "but for" causation for Grain Processing's alleged lost sales. Upholding the district court's findings and conclusions, this court affirms.

Geoffrey G. Gilbert, McBride, Baker & Coles, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief was Marc L. Fogelberg.

Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for defendant-appellee. With him on the brief were Nicholas N. Kallas and Dominick A. Conde.

Before RADER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

RADER, Circuit Judge.

The United States District Court for the Northern District of Indiana denied Grain Processing Corporation lost profits for American Maize–Products' infringement of U.S. Patent No. 3,849,194 (the '194 patent). *Grain Processing Corp. v. American Maize–Products Co.*, 979 F.Supp. 1233, 44 USPQ2d 1782 (N.D.Ind.1997) (*Grain Processing VIII* ). The district court instead awarded Grain Processing a 3% royalty on American Maize's infringing sales. *Id.;* see also *Grain Processing Corp. v. Ameri-*

I.

This appeal culminates the lengthy and complex history of this case, spanning more than eighteen years and eight prior judicial opinions, three by this court. The patent featured in this infringement suit involves maltodextrins, a versatile family of food additives made from starch. Commercial food manufacturers purchase hundreds of millions of pounds of maltodextrins annually from producers such as Grain Processing and American Maize.

Maltodextrins serve well as food additives because they are bland in taste and clear in solution. They do not affect the natural taste or color of other ingredients in food products. Maltodextrins also improve the structure or behavior of food products. For instance, they inhibit crystal growth, add body, improve binding and viscosity, and preserve food properties in low temperatures. Consequently, food manufacturers use maltodextrins in a wide variety of products such as frostings, syrups, drinks, cereals, and frozen foods.

Maltodextrins belong to a category of chemical products known as "starch hydro-

lysates." Producers make starch hydrolysates by putting starch through hydrolysis, a chemical reaction with water. Hydrolysis breaks down the starch and converts some of it to dextrose.[1] With adjustments, this process yields more dextrose. For instance, additional enzymes, time extensions, and increases in temperature or pH enhance the reaction. After hydrolysis, the producer typically refines, spray-dries, and packages the starch hydrolysate for sale in powder form.

Maltodextrins are starch hydrolysates that have a "dextrose equivalence" of less than 20. Dextrose equivalence (D.E.) is a percentage measurement of the "reducing sugars content" of the starch hydrolysate. D.E. reflects the degree to which the hydrolysis process broke down the starch and converted it into dextrose. Converting more starch into dextrose increases the D.E. of the resulting starch hydrolysate. Hence, pure starch has a D.E. of zero, pure dextrose a D.E. of 100. The D.E. value indicates functional properties of a maltodextrin. A 15 D.E. maltodextrin, for example, is slightly sweeter and more soluble than a 5 D.E. maltodextrin. On the other hand, the 5 D.E. maltodextrin has more prevalent binding, bodying, and crystal inhibiting properties.

Grain Processing is the assignee of the '194 patent, "Low D.E. Starch Conversion Products," which claims maltodextrins with particular attributes, and processes for producing them. The claimed invention represents improvements in the "heavily explored" field of starch hydrolysates. *See Grain Processing Corp. v. American Maize–Products Co.*, No. 81–0237, slip op. at 1 (N.D.Ind. March 16, 1987) (*Grain Processing I*), *rev'd*, 840 F.2d 902, 5 USPQ2d 1788 (Fed.Cir.1988) (*Grain Processing II*). Claim 12, the sole claim on appeal, reads:

12. A *waxy* starch hydrolysate having

a dextrose equivalent value between about 5 and about 25;

a descriptive ratio greater than about 2, said descriptive ratio being the quotient obtained by dividing the sum of the percentage of saccharides, dry basis, having a degree of polymerization of 1 to 6, by the dextrose equivalent value;

a monosaccharide content in the range of from about 0.1 percent by weight, to about 2.4 percent by weight, dry basis;

a dissaccharide content in the range of from about 1.3 percent to about 9.7 percent, by weight, dry basis; and

being further characterized as capable of producing an aqueous solution of exceptional clarity and substantially complete lack of opaqueness when said hydrolysate is added to water.

(Emphasis added.)

Grain Processing has manufactured and sold a line of maltodextrins under the "Maltrin" brand name since 1969. The Maltrin line includes "Maltrin M100," a 10 D.E. maltodextrin. None of the Maltrin products, including M100, fall within claim 12 because they are all made from a non-waxy starch. *See Grain Processing I*, No. 81–0237, slip op. at 65 (construing claim 12 to require a waxy starch, as recited in the preamble).

American Maize began selling maltodextrins in 1974. It made and sold several types of maltodextrins, including "Lo–Dex 10," a 10 D.E. waxy starch maltodextrin. American Maize sold Lo–Dex 10 (called Fro–Dex 10 before 1982) during the entire time Grain Processing owned the '194 patent rights, from 1979 until the patent expired in 1991. During this time, however,

---

1. More specifically, a starch molecule is a complex carbohydrate, *i.e.*, it is a chain of carbohydrate molecules, $(C_6H_{10}O_5)_n$, where n is the number of molecules in the chain.

Hydrolysis breaks the bonds between some of the $C_6H_{10}O_5$ molecules and converts them to dextrose, $C_6H_{12}O_6$.

American Maize used four different processes for producing Lo–Dex 10. The changes in American Maize's production processes, and the slight chemical differences in the Lo–Dex 10 from each process, are central to the lost profits issue in this appeal.

American Maize used a first process (Process I) from June 1974 to July 1982. In Process I, American Maize used a single enzyme (an alpha amylase) to facilitate starch hydrolysis. American Maize controlled the reaction to produce a starch hydrolysate with the desired properties, including D.E. value.

Grain Processing sued American Maize for infringement on May 12, 1981, based on American Maize's Lo–Dex 10 sales as well as sales of two other maltodextrins – Lo–Dex 5 and ARD 2370. Grain Processing asserted all fourteen claims of the '194 patent, including product and process claims. The district court bifurcated the infringement and damages issues for trial.

In August 1982, while the suit was pending, American Maize reduced the amount of alpha amylase enzyme in its process to lower its production costs. To achieve the same end result with less enzyme, American Maize continued the reaction longer. American Maize used this process (Process II) exclusively to produce Lo–Dex 10 from August 1982 to February 1988. Grain Processing asserted in its lawsuit that Process II Lo–Dex 10 also infringed the '194 patent.

American Maize contended that Lo–Dex 10 (by both Processes I and II) did not infringe claim 12 of the '194 patent because it did not have a "descriptive ratio greater than about 2," as required by the claim.[2] Descriptive ratio (D.R.) is a function of the D.E. measurement. According to the formula in claim 12, D.R. is inversely proportional to D.E. Because different scientific tests yield slightly different D.E. measurements, the resulting D.R. values derived therefrom also vary slightly.

When Grain Processing accused American Maize of infringement, Grain Processing used the "Schoorl test" for measuring the D.E. of Lo–Dex 10. American Maize, on the other hand, used the "Lane–Eynon test," which it believed was the "industry standard," to measure D.E. The Schoorl test tends to yield a lower D.E. and therefore a higher D.R. than Lane–Eynon. Under the Lane–Eynon test, American Maize's measurements revealed that Lo–Dex 10 did not infringe claim 12, because all of its Lo–Dex 10 samples had a D.R. of less than 1.9. Grain Processing's Schoorl tests on the same samples, however, yielded a D.R. of greater than 2.

Following a bench trial, the district court held that Lo–Dex 10 did not infringe any of the claims because it did not meet the "exceptional clarity" limitation. This court reversed, holding that Lo–Dex 10 met the "exceptional clarity" limitation and therefore infringed claim 12 and its dependent claims 13–14. *Grain Processing II,* 840 F.2d at 911. This court's decision, like the district court's, did not resolve the discrepancy between tests for measuring D.E. value. The district court subsequently entered an injunction on October 21, 1988, prohibiting American Maize from making or selling Lo–Dex 10 or any other waxy starch hydrolysate that infringed claims 12–14.

In response to the injunction, American Maize developed yet another process for producing Lo–Dex 10. In this new process (Process III), American Maize used more alpha amylase, adjusted the temperature and pH, and reduced the reaction time. American Maize used Process III exclusively to produce Lo–Dex 10 from March 1988 to April 1991.

---

**2.** The district court later interpreted the "about 2" limitation to require a minimum D.R. of 1.9, a finding the parties do not challenge.

American Maize believed Process III would yield a more uniform, noninfringing output of Lo–Dex 10. *See Grain Processing VI*, 893 F.Supp. at 1391. In fact, American Maize was "determined to avoid shipping a single bag of Lo–Dex 10 with a D.R. exceeding 1.9." *See id.* Process III worked as American Maize intended. American Maize's measurements – using the Lane–Eynon test – showed that Process III Lo–Dex 10 samples all had descriptive ratios of less than 1.9 and therefore did not infringe. *See id.* Moreover, American Maize's customers did not discern any difference between Process III Lo–Dex 10 and Lo–Dex 10 from Processes I or II. *See id.*

In 1990, Grain Processing tested commercial samples of American Maize's Process III Lo–Dex 10. Grain Processing again used the Schoorl test to measure D.E. Grain Processing's measurements showed that American Maize's Process III output had a D.R. value of greater than 1.9 and therefore infringed. Grain Processing filed a contempt motion in the district court.

The district court initially held American Maize in contempt for continuing to sell an infringing product. *Grain Processing Corp. v. American Maize–Products Co.*, No. 81–0237 (N.D.Ind. May 15, 1990) (*Grain Processing III*), *modified*, No. 81–0237, (N.D.Ind. July 16, 1990) (*Grain Processing IV*), *rev'd*, 932 F.2d 981, 21 USPQ2d 1474 (Fed.Cir.1991) (nonprecedential) (*Grain Processing V*). However, the district court modified the order in 1991 to allow American Maize to use any scientifically acceptable method to show noninfringement. *Grain Processing IV*, No. 81–0237. Because American Maize's Process III output consistently had a D.R. of less than 1.9 using Lane–Eynon, the district court ruled that it did not infringe. *Id.* Grain Processing appealed. This court reversed in a nonprecedential opinion. *Grain Processing V*, 21 USPQ2d 1474.

Because the prosecution history of the '194 patent indicates that the inventor used the Schoorl test to measure D.E. of his invention, this court held that the Schoorl test, not Lane–Eynon, determines the relevant values in this case. *Id.* at 1477.

American Maize then adopted a fourth process (Process IV) for producing Lo–Dex 10. In Process IV, American Maize added a second enzyme, glucoamylase, to the reaction. Glucoamylase breaks down starch to a shorter average saccharide length. This shorter saccharide length yields a smaller D.R. without affecting D.E.

From the time American Maize began experimenting with the glucoamylase-alpha amylase combination, or the "dual enzyme method," it took only two weeks to perfect the reaction and begin mass producing Lo–Dex 10 using Process IV. *See Grain Processing VI*, 893 F.Supp. at 1391. According to the finding of the district court, this two-week development and production time is "practically instantaneous" for large-scale production. *Id.* American Maize simply experimented with different combinations of glucoamylase and alpha amylase, along with pH, heat, and time of the reaction. *See id.* American Maize did not change any equipment, source starches, or other ingredients from Process III. *See id.* Glucoamylase has been commercially available and its effect in starch hydrolysis widely known since the early 1970's, before the '194 patent issued. *See id.* American Maize had not used Process IV to produce Lo–Dex earlier because the high cost of glucoamylase makes Process IV more expensive than the other processes. *See id.* at 1392.

The parties agree that Process IV yielded only noninfringing Lo–Dex 10 and that consumers discerned no difference between Process IV Lo–Dex 10 and Lo–Dex 10 made by Processes I–III. American Maize used Process IV exclusively to pro-

duce Lo–Dex 10 from April 1991 until the '194 patent expired in November 1991, and then switched back to the cheaper Process III.

The district court commenced the damages portion of the trial on July 10, 1995. Grain Processing claimed lost profits in the form of lost sales of Maltrin M100, price erosion, and American Maize's accelerated market entry after the patent expired. Grain Processing further claimed that, for any of American Maize's infringing sales not covered by a lost profits award, Grain Processing should receive a 28% royalty. After a three day bench trial, the district court denied lost profits and determined that a 3% reasonable royalty was adequate to compensate Grain Processing. *Grain Processing VI*, 893 F.Supp. at 1392–93. The royalty applies to all of American Maize's Lo–Dex 10 sales from May 12, 1981 (when Grain Processing filed suit)[3] to April 1991 (when American Maize converted to Process IV, thereby producing a noninfringing product).

The trial court determined that Grain Processing could not establish causation for lost profits, because American Maize "could have produced" a noninfringing substitute 10 D.E. maltodextrin using Process IV. *Grain Processing VI*, 893 F.Supp. at 1391–92. "With infringing Lo–Dex 10 banned, the customers' substitute is noninfringing Lo–Dex 10." *Id.* at 1392 (emphasis added). American Maize did not actually produce and sell this noninfringing substitute until April 1991, seven months before the '194 patent expired, but the district court nevertheless found that its availability "scotches [Grain Processing's] request for lost-profits damages." *Id.*

The district court also found that American Maize's production cost difference be-

tween infringing and noninfringing Lo–Dex 10 effectively capped the reasonable royalty award. American Maize showed that it cost only 2.3% more to make noninfringing Process IV products than it did to make infringing Process I–III products. *See Grain Processing VI*, 893 F.Supp. at 1392. The district court also found that "buyers viewed as equivalent" the Process I–III and Process IV output: "Lo–Dex 10 made by Process IV had a lower D.R. [which is what makes it noninfringing] . . . but no one argues that any customer cared a whit about the product's descriptive ratio." *Id.* at 1390. The district court concluded that under these facts, American Maize, when faced with a hypothetical offer to license the '194 patent in 1974 (or to renegotiate the rate in 1979, when Grain Processing acquired the patent rights and its ability to collect damages began), would not have paid more than a 3% royalty rate. The court reasoned that this rate would reflect the cost difference between Processes I–III and Process IV, while also taking into account possible cost fluctuations (due to fluctuating enzyme prices) and the elimination of American Maize's risk of producing an infringing product, despite its best efforts. *Id.* at 1393. The court concluded that if Grain Processing had insisted on a rate greater than 3% in the hypothetical negotiations, American Maize instead would have chosen to invest in producing noninfringing Lo–Dex 10 with Process IV. *Id.*

Grain Processing appealed the district court's denial of lost profits, alleging that American Maize cannot escape liability for lost profits on the basis of "a noninfringing substitute that did not exist during, and was not developed until after, the period of infringement." *Grain Processing VII*, 1997 WL 71726, at \*\*1. This court reversed and remanded. *Id.* This court ob-

---

**3.** Grain Processing was not entitled to damages before this date because neither Grain Processing nor its predecessor in interest had marked the Mor–Rex products with the patent number pursuant to 35 U.S.C. § 287(a) (1994). *See Grain Processing VI*, 893 F.Supp. at 1393–95.

served that "[t]he [district] court denied [Grain Processing's] request for lost profits because [American Maize] developed a new process of producing Lo–Dex 10 in 1991 [after years of infringement] that did not infringe the '194 patent." *Id.* This court noted, however, that the mere fact of "switching to a noninfringing product years after the period of infringement [does] not establish the presence of a non-infringing substitute during the period of infringement." *Id.* at **2 (citing *State Indus., Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573, 1579, 12 USPQ2d 1026, 1030 (Fed.Cir.1989); *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,* 575 F.2d 1152, 1160–62, 197 USPQ 726, 734–35 (6th Cir. 1978)). This court noted that a product or process must be "available or on the market at the time of infringement" to qualify as an acceptable non-infringing substitute. *Grain Processing VII,* 1997 WL 71726, at **2 (emphasis added).

On remand, the district court again denied Grain Processing lost profits. The district court found that Process IV was "available" throughout the period of infringement. *Grain Processing VIII,* 979 F.Supp. at 1235. This factual finding, the district court explained, was not based merely on "the simple fact of switching [to Process IV]" but rather on several subsidiary factual findings regarding the technology of enzyme-assisted starch hydrolysis and the price and market structure for the patentee's and accused infringer's products. *Id.* at 1234–35. The trial court found that American Maize could obtain all of the materials needed for Process IV, including the glucoamylase enzyme, before 1979, and that the effects of the enzymes in starch hydrolysis were well known in the field by that time. *Id.* American Maize also had all of the necessary equipment, know-how, and experience to implement Process IV whenever it chose to do so during the time of infringement. *See id.* "The sole reason [American Maize did not use Process IV to produce Lo–Dex 10 prior to 1991] was economic: glucoamylyse is more expensive than the alpha amylase enzyme that [American Maize] had been using." *Id.* American Maize did not make the substitution sooner because its test results using the Lane–Eynon method convinced it that it was not infringing. *See id.*

The district court concluded that "the profit lost from infringement is the cost and market price difference attributable to using glucoamylase." *Grain Processing VIII,* 979 F.Supp. at 1237. The court did not further address the amount of damages, having already found in *Grain Processing VI* that the infringement did not affect the market price of Lo–Dex 10, and having figured the 2.3% cost increase into the 3% royalty award.

The district court also went on to explain its denial of lost profits "from a different angle." *Grain Processing VIII,* 979 F.Supp. at 1237. The district court stated that *Panduit* and *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 35 USPQ2d 1065 (Fed.Cir.1995) (en banc) "identify demand for the patented product as an essential element of the patent holder's lost-profits claim." *Grain Processing VIII,* 979 F.Supp. at 1237. The district court recognized that there was "substantial demand for D.E. 10 maltodextrins." *Id.* However, the district court stated the dispositive question as "whether there is economically significant demand for a product having all ... attributes [of the claim in suit]," *i.e.,* whether consumers demand every claimed feature. *Id.* The court found no such demand in this case because "[t]wo of the essential elements of the claim – that the starch be 'waxy' and that the 'descriptive ratio [be] greater than about 2' – are irrelevant to consumers." *Id.* The court concluded that Grain Processing "does not have a patent on D.E. 10 maltodextrins, the economically significant product, and therefore cannot recover lost profits damages on account of [American Maize's] infringement." *Id.* at 1238.

Grain Processing appeals the district court's decision.

## II.

The district court must exercise sound discretion to determine the amount of damages, based upon its underlying factual findings and legal conclusions. *See State Indus.*, 883 F.2d at 1576–77. This court reviews the district court's damages decision for "an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion." *Id.* at 1577; *Rite-Hite*, 56 F.3d at 1543–44.

Upon proof of infringement, Title 35, Section 284 provides that "the court shall award [the patent owner] damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (1998). The phrase "damages adequate to compensate" means "full compensation for 'any damages' [the patent owner] suffered as a result of the infringement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983). Full compensation includes any foreseeable lost profits the patent owner can prove. *See Rite-Hite*, 56 F.3d at 1545–47.

To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits. *See King Instruments Corp. v. Perego*, 65 F.3d 941, 952, 36 USPQ2d 1129, 1137 (Fed.Cir.1995). When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement. *See id.; Rite-Hite*, 56 F.3d at 1545. Once the patent owner establishes a reasonable probability of "but for" causa-

tion, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales." *Id.* at 1544.

At trial, American Maize proved that Grain Processing's lost sales assertions were unreasonable. The district court adopted Grain Processing's initial premise that, because Grain Processing and American Maize competed head-to-head as the only significant suppliers of 10 D.E. maltodextrins, consumers logically would purchase Maltrin 100 if Lo–Dex 10 were not available. *See Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983) (holding that the patent owner may satisfy his initial burden by inference in a two-supplier market). However, the district court found that American Maize proved that Process IV was available and that Process IV Lo–Dex 10 was an acceptable substitute for the claimed invention. In the face of this noninfringing substitute, Grain Processing could not prove lost profits. *See Grain Processing VIII*, 979 F.Supp. at 1234–35.

American Maize concedes that it did not make or sell Lo–Dex 10 from Process IV until 1991, after the period of infringement. However, an alleged substitute not "on the market" or "for sale" during the infringement can figure prominently in determining whether a patentee would have made additional profits "but for" the infringement. As this court stated in *Grain Processing VII*, "to be an acceptable non-infringing substitute, the product or process must have been available *or* on the market at the time of infringement." *Grain Processing VII*, 1997 WL 71726, at **2 (emphasis added). This statement is an apt summary of this court's precedent, which permits available alternatives – including but not limited to products on the market – to preclude lost profits damages.

In *Aro Manufacturing,* the Supreme Court stated that the statutory measure of "damages" is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457, 141 USPQ 681, 694 (1964) (plurality opinion), quoting *Yale Lock Mfg. Co. v. Sargent,* 117 U.S. 536, 552, 6 S.Ct. 934, 942, 29 L.Ed. 954 (1886). The determinative question, the Supreme Court stated, is: "had the Infringer not infringed, what would the Patent Holder–Licensee have made?" *Aro,* 377 U.S. at 507, 84 S.Ct. 1526 (quoting *Livesay Window Co. v. Livesay Indus., Inc.,* 251 F.2d 469, 471, 116 USPQ 167, 168 (5th Cir.1958)); *see also Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1579, 24 USPQ2d 1401, 1418 (Fed.Cir.1992). The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would ... have made." *See Grain Processing VIII,* 979 F.Supp. at 1236.

▮ Reconstructing the market, by definition a hypothetical enterprise, requires the patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture. *See Oiness v. Walgreen Co.,* 88 F.3d 1025, 1029–30, 39 USPQ2d 1304, 1307 (Fed.Cir.1996); *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 673, 7 USPQ2d 1097, 1107–08 (Fed. Cir.1988). Within this framework, trial courts, with this court's approval, consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly

to recover lost profits in a wide variety of forms. *See, e.g., King Instruments,* 65 F.3d at 953 (upholding award for lost sales of patentee's unpatented goods that compete with the infringing goods); *Rite–Hite,* 56 F.3d at 1550 (holding that a patentee may recover lost profits on components that have a functional relationship with the patented invention); *Brooktree Corp.,* 977 F.2d at 1580 (upholding award for price erosion due to infringer's marketing activities); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1579, 24 USPQ2d 1321, 1337 (Fed.Cir.1992) (upholding award for price erosion due to infringing sales); *State Indus.,* 883 F.2d at 1580 (upholding award of lost profits in proportion to patentee's market share of the relevant market including acceptable noninfringing substitutes); *Paper Converting Mach. Corp. v. Magna–Graphics Corp.,* 745 F.2d 11, 22, 223 USPQ 591, 599 (Fed.Cir.1984) (upholding award compensating the patentee for its decreasing marginal cost of producing the good, *i.e.,* its increasing marginal profit, as its volume of production would have increased); *Lam,* 718 F.2d at 1065 (upholding lost profits award for future lost sales, and for the patentee's increased promotional expenses); *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.,* 687 F.Supp. 134, 137–38, 9 USPQ2d 1152, 1154 (S.D.N.Y.1988), *rev'd in part on other grounds,* 1 F.3d 1214, 27 USPQ2d 1671 (Fed.Cir.1993) (permitting recovery for future depressed prices, *i.e.,* "projected price erosion", and for accelerated market reentry by the infringer). In sum, courts have given patentees significant latitude to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement.

▮ By the same token, a fair and accurate reconstruction of the "but for" market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he

not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the "but for" marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner. Moreover, only by comparing the patented invention to its next-best available alternative(s) – regardless of whether the alternative(s) were actually produced and sold during the infringement – can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right. *Cf. Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614–15, 32 S.Ct. 691, 694, 56 L.Ed. 1222 (1912); *Mowry v. Whitney*, 81 U.S. (14 Wall.) 620, 651, 20 L.Ed. 860 (1871); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 865, 226 USPQ 402, 410–11 (Fed.Cir.1985). Thus, an accurate reconstruction of the hypothetical "but for" market takes into account any alternatives available to the infringer. *See Aro*, 377 U.S. at 507, 84 S.Ct. 1526; *Yale Lock*, 117 U.S. at 552–53, 6 S.Ct. 934; *see also* ROBERT P. MERGES, PATENT LAW 1080 (2d Ed.1997) ("[T]he infringer should have a chance to argue what he or she might have done in the absence of infringement. Obviously, if the defendant is not permitted to present evidence of this ilk, the analysis is quite skewed: only the patentee's 'best case' scenario is presented, rather than a more realistic scenario."); MARTIN J. ADELMAN, PATENT PERSPECTIVES § 5.2[2] (2d Ed.1998) ("[w]here an infringer demonstrates that it could have chosen to market a noninfringing alternative and that it would have done so had it known that it was infringing ... the sales that it made of the infringing products were not sales that the patentee would otherwise

have made...."); JOHN W. SCHLICHER, PATENT LAW: LEGAL AND ECONOMIC PRINCIPLES § 9.05[2][l] (1997) ("unless the law wishes to systematically overreward patented inventions, it is necessary to inquire about the nature and value of the product that the infringer could have made had he not infringed.").

Accordingly, this court in *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.* held that an available technology not on the market during the infringement can constitute a noninfringing alternative. 932 F.2d 1453, 18 USPQ2d 1842 (Fed.Cir. 1991). In *Slimfold*, the patent owner (Slimfold) claimed lost profits on its bi-fold doors with a patented pivot and guide rod assembly. This court noted, however, that Slimfold did not show "that the alleged infringer [Kinkead] would not have made a substantial portion or the same number of sales *had it continued with its old hardware* or with the hardware utilized by any of the other companies." *Id.* at 1458 (emphasis added). On the basis of this noninfringing substitute, which was not on the market at the time of infringement, this court affirmed the district court's denial of lost profits. This court determined that the record supported the district court's finding that this noninfringing "old hardware" was available to Kinkead at the time of the infringement. Specifically, Kinkead and others had used the substitute technology on other doors before the period of infringement. *See id.* Furthermore, consumers considered Kinkead's noninfringing alternative an acceptable substitute for the infringing doors. *See id.* Therefore, this court upheld the district court's award of a "small" royalty, rather than lost profits. *Id.* at 1458–59.

Several opinions of this court have noted that "market sales" provide significant evidence of availability as a substitute. *See, e.g., Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119, 40 USPQ2d 1001, 1008 (Fed.Cir.1996); *Zygo Corp. v. Wyko Corp.*,

79 F.3d 1563, 38 USPQ2d 1281 (Fed.Cir. 1996); *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 17 USPQ2d 1828 (Fed.Cir. 1991); *State Indus.*, 883 F.2d at 1579; *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 220 USPQ 490 (Fed.Cir. 1983). These cases illustrate that market sales of an acceptable noninfringing substitute often suffice alone to defeat a case for lost profits. Focusing exclusively on this market sales principle, these opinions did not address availability without market sales. *See, e.g., Kaufman*, 926 F.2d at 1142 (an alleged alternative product "was not an acceptable *purchase* option during the infringement") (emphasis added); *Central Soya*, 723 F.2d at 1579 ("[t]he dispositive determination at trial . . . was whether or not there was an acceptable substitute on the market."); *Panduit*, 575 F.2d at 1162 ("[t]hat Stahlin's customers, no longer able to buy the patented product from Stahlin, were willing to buy something else from Stahlin, does not establish that there was *on the market* during the period of infringement a product which customers in general were . . . 'willing to buy in place of the infringing product.'") (emphasis added). Because these previous cases addressed only market sales, they did not consider that available substitutes, though not literally on sale, can affect market behavior as in the present case.

Nor does *Zygo* support Grain Processing's position equating availability with offers for sale. In *Zygo*, this court reviewed for clear error the district court's factual finding that the infringer's "SIRIS" interferometer was not an acceptable noninfringing substitute. *Zygo*, 79 F.3d at 1571. Like the accused infringer in the *Slimfold* case, the infringer in *Zygo* had "stopped marketing" the SIRIS when it began marketing the infringing interferometer. *See id.* In the words of this court, "[t]he central damages issue on appeal is whether . . . Wyko's SIRIS interferometer was . . . an *acceptable* nonin-

fringing alternative. . . ." *Id.* (emphasis added). On that "central" point, this court noted "the insufficiency of the [district] court's findings" that the SIRIS interferometer was not acceptable, and observed that "the record evidence, while sparse, suggests a contrary conclusion." *Id.* Therefore, this court remanded for additional factual findings. *Id.* In addition to holding that the district court's decision lacked sufficient factual support, this court also opined: "[i]t is axiomatic . . . that if a device is not available for purchase, a defendant cannot argue that the device is an acceptable noninfringing alternative. . . ." *Id.* This statement beyond the premises necessary to resolve the legal issues in *Zygo* did not alter the standards for availability applied in the earlier *Slimfold* case and in subsequent cases. *See Gargoyles, Inc. v. United States*, 113 F.3d 1572, 42 USPQ2d 1760 (Fed.Cir.1997) (denying lost profits because a substitute that was not on sale was "available" to the relevant consumer, the Army); *Minco*, 95 F.3d at 1119 (considering allegedly available substitutes that were not on sale during the infringement); *Minnesota Mining & Mfg. Co.*, 976 F.2d at 1579 (determining that the infringer had an alternative available from a supplier in Europe, but that it was not acceptable). Rather, at most it reflects a finding on the record in *Zygo* that availability of the substitute in that case depended on direct market sales.

Grain Processing asserts that permitting the infringer to show substitute availability without market sales, thereby avoiding lost profits, undercompensates for infringement. Section 284, however, sets the floor for "damages adequate to compensate for the infringement" as "a reasonable royalty." 35 U.S.C. § 284. Thus, the statute specifically envisions a reasonable royalty as a form of adequate compensation. While "damages adequate to compensate" means "full compensation," *General Motors*, 461 U.S. at 654, 103 S.Ct. 2058, "full

compensation" does not entitle Grain Processing to lost profits in the absence of "but for" causation. *Rite–Hite*, 56 F.3d at 1545. Moreover, although Grain Processing stresses that American Maize should not reap the benefit of its "choice" to infringe rather than use the more expensive Process IV, Grain Processing does not allege willful infringement and the record shows none. *See, e.g., Grain Processing VI*, 893 F.Supp. at 1391 (noting that American Maize eliminated the infringing product "practically instantaneous[ly"] upon becoming aware of infringement). To the extent that Grain Processing feels undercompensated,[4] it must point out a reversible error in the district court's fact-finding, reasoning, or legal basis for denying lost profits or in its reasonable royalty determination.[5]

### III.

◼ This court next turns to the district court's findings that Process IV was in fact "available" to American Maize for producing Lo–Dex 10 no later than October, 1979, and that consumers would consider Process IV Lo–Dex 10 an acceptable substitute. This court reviews these factual findings for clear error. *See Gargoyles*, 113 F.3d at 1573; *Slimfold*, 932 F.2d at 1458.

◼ The critical time period for determining availability of an alternative is the period of infringement for which the

patent owner claims damages, *i.e.*, the "accounting period." *See State Indus.*, 883 F.2d at 1579; *Panduit*, 575 F.2d at 1162. Switching to a noninfringing substitute after the accounting period does not alone show availability of the noninfringing substitute during this critical time. *See Panduit*, 575 F.2d at 1152. When an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time. *Cf. Rite–Hite*, 56 F.3d at 1545. The accused infringer then has the burden to overcome this inference by showing that the substitute was available during the accounting period. *Cf. id.* Mere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing, rather than noninfringing, product. Thus, the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement. Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not. *See Minco*, 95 F.3d at 1119.

In this case, the district court did not base its finding that Process IV was available no later than October 1979 on speculation or possibilities, but rather on several specific, concrete factual findings, none of which Grain Processing challenges on ap-

---

4. The district court's 3% royalty rate yielded damages of approximately $2.4 million; Grain Processing sought lost profits of $35 million, which with applicable interest presently implies an award approaching $100 million.

5. The district court appears to have conducted a thorough royalty analysis, challenged by neither party on appeal. The court candidly stated that the 3% rate is its "best estimate," an honest observation that would apply to most reasonable royalty analyses, given the difficulty of determining a hypothetical agreement between parties which did not actually

agree on anything at all. The determination is perhaps more difficult when the patentee is not selling the patented product, as is the case here. *See In re Mahurkar*, 831 F.Supp. 1354, 1383, 28 USPQ2d 1801, 1824 (N.D.Ill.1993). Nevertheless, the district court supported its royalty amount with sound economic data and with actual, observed behavior in the market. Though both parties maintained at trial that they would not have agreed to a license including 3% royalties at the time of infringement, the appropriateness of the rate is perhaps reflected in the decision of the parties to forego an appeal on this issue.

peal. The district court found that American Maize could readily obtain all of the materials needed for Process IV, including the glucoamylase enzyme, before 1979. The court also found that the effects of the enzymes in starch hydrolysis were well known in the field at that time. *Grain Processing VI*, 893 F.Supp. at 1391; *Grain Processing VIII*, 979 F.Supp. at 1235. Furthermore, the court found that American Maize had all of the necessary equipment, know-how, and experience to use Process IV to make Lo–Dex 10, whenever it chose to do so during the time it was instead using Processes I, II or III. *Grain Processing VIII*, 979 F.Supp. at 1235. American Maize "did not have to 'invent around' the patent," the district court observed; "all it had to do was use a glucoamaylase enzyme in its production process." *Id.*

The trial court also explained that "the sole reason [American Maize did not use Process IV prior to 1991] was economic: glucoamylase is more expensive than the alpha amylase enzyme American Maize had been using," and American Maize reasonably believed it had a noninfringing product. *Grain Processing VIII*, 979 F.Supp. at 1235. While the high cost of a necessary material can conceivably render a substitute "unavailable," the facts of this case show that glucoamylase was not prohibitively expensive to American Maize. The district court found that American Maize's "substantial profit margins" on Lo–Dex 10 were sufficient for it to absorb the 2.3% cost increase using glucoamylase. *Id.* at 1239.

Moreover, the district court's unchallenged finding that there is no "economically significant demand for a product having all of the [claimed] attributes" supports its conclusion of availability. *Grain Processing VIII*, 979 F.Supp. at 1237. Consumers demand "low-dextrose maltodextrins of which the patented product is just one *exemplar*." *Id.* (emphasis added).

Because consumers find the "waxy" and "descriptive ratio" elements of claim 12 "irrelevant," the prospect of an available, acceptable noninfringing substitute expands because a competitor may be able to drop or replace the "irrelevant" elements from its product. *Compare Rite–Hite*, 56 F.3d 1538 (upholding lost profits award for patentee's vehicle restraint – not covered by the patent in suit – because the patentee could exclude alleged substitute products with another patent) *with King Instrument*, 72 F.3d 855 (upholding only a *partial* award of lost profits for patentee's tape rewinder – not covered by any patent – due to the availability of alternatives acceptable to some consumers); *see also Panduit*, 575 F.2d at 1156, 1160–61 (holding that consumer demand for the "unique advantages" of the patented invention, as opposed to substitutes lacking some elements, and the infringer's "inability to avoid infringement even if it had wanted to," established the lack of available, acceptable noninfringing alternatives). Grain Processing cannot exclude Process IV Lo–Dex 10 because it does not have a patent on 10 D.E. maltodextrins, "the economically significant product" as the district court stated, *Grain Processing VIII*, 979 F.Supp. at 1238, but rather on a particular variety of 10 D.E. maltodextrins.

This court therefore does not detect, and the parties do not suggest, clear error in the district court's factual findings on the availability of Process IV. These factual findings support the district court's conclusion that Process IV was available to American Maize for making noninfringing Lo–Dex 10, no later than October 1991. American Maize had the necessary chemical materials, the equipment, the know-how and experience, and the economic incentive to produce Lo–Dex 10 by Process IV throughout the entire accounting period. Accordingly, this court holds that the district court did not clearly err in finding that Process IV Lo–Dex 10 was an avail-

able alternative throughout the accounting period.

■ Whether and to what extent American Maize's alleged alternative prevents Grain Processing from showing lost sales of Maltrin 100 depends not only on whether and when the alternative was available, but also on whether and to what extent it was acceptable as a substitute in the relevant market. *See King Instruments,* 65 F.3d at 952. Consumer demand defines the relevant market and relative substitutability among products therein. *See BIC,* 1 F.3d at 1218; *cf. United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 392–95, 76 S.Ct. 994, 1005–07, 100 L.Ed. 1264 (1956). Important factors shaping demand may include consumers' intended use for the patentee's product, similarity of physical and functional attributes of the patentee's product to alleged competing products, and price. *See Fonar Corp. v. General Elec. Co.,* 107 F.3d 1543, 1553, 41 USPQ2d 1801, 1808–09 (Fed.Cir. 1997); *BIC,* 1 F.3d at 1218. Where the alleged substitute differs from the patentee's product in one or more of these respects, the patentee often must adduce economic data supporting its theory of the relevant market in order to show "but for" causation. *See BIC,* 1 F.3d at 1218.

In this case, the parties vigorously dispute the precise scope of the relevant market. *See Grain Processing VIII,* 979 F.Supp. at 1235 (stating that, contrary to Grain Processing's argument that 10 D.E. maltodextrins comprise their own market, 10 D.E. maltodextrins compete in a market with other food additives). The district court's uncontroverted factual findings, however, render this dispute moot. In the eyes of consumers, according to the district court, Process IV Lo–Dex 10 was the same product, for the same price, from the same supplier as Lo–Dex 10 made by other processes. *See Grain Processing VI,* 893 F.Supp. at 1391–92. Process IV Lo–

Dex 10 was a perfect substitute for previous versions, and therefore Grain Processing's efforts to show a distinct 10 D.E. maltodextrin market do not assist its lost profits case.

Market evidence in the record supports the district court's uncontroverted findings and conclusions on acceptability. First, for example, American Maize's high profit margin on Lo–Dex 10 and the consumers' sensitivity to price changes support the conclusion that American Maize would not have raised the price of Process IV Lo–Dex 10 to offset the cost of glucoamylase. Further, American Maize's sales records showed no significant changes when it introduced Process IV Lo–Dex 10 at the same price as previous versions, indicating that consumers considered its important properties to be effectively identical to previous versions. Witness testimony supported this market data. Thus, this court discerns no clear error in the district court's finding that Process IV Lo–Dex 10 was an acceptable substitute in the marketplace.

It follows from the district court's findings on availability and acceptability that Grain Processing's theory of "but for" causation fails. As the district court correctly noted, "[a]n [American Maize] using the dual-enzyme method between 1979 and 1991 ... would have sold the same product, for the same price, as the actual [American Maize] did ..." and consequently would have retained its Lo–Dex 10 sales. *Grain Processing VI,* 893 F.Supp. at 1392. Grain Processing did not present any other evidence of lost profits, such as individual lost transactions as in *Rite–Hite Corp. v. Kelley Co.,* 774 F.Supp. 1514, 1525–26, 1528–29, 21 USPQ2d 1801 (E.D.Wis.1991), *aff'd in part and vacated on other grounds,* 56 F.3d 1538. Thus, the district court properly determined that, absent infringing Lo–Dex 10, Grain Processing would have sold no more and no less Maltrin 100 than it actually did.

## IV.

In summary, this court requires reliable economic proof of the market that establishes an accurate context to project the likely results "but for" the infringement. *See, e.g., Oiness,* 88 F.3d 1025; *BIC,* 1 F.3d 1214; *Water Technologies,* 850 F.2d 660. The availability of substitutes invariably will influence the market forces defining this "but for" marketplace, as it did in this case. Moreover, a substitute need not be openly on sale to exert this influence. Thus, with proper economic proof of availability, as American Maize provided the district court in this case, an acceptable substitute not on the market during the infringement may nonetheless become part of the lost profits calculus and therefore limit or preclude those damages.

This court concludes that the district court did not err in considering an alternative not on the market during the period of infringement, nor did it clearly err in determining that the alternative was available, acceptable, and precluded any lost profits. Accordingly, the district court did not abuse its discretion in denying lost profits. This court affirms the district court's decision.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*