DYK, Circuit Judge,
concurring in part and dissenting in part.
I
“To recover lost profits, the patent owner must show ‘causation in fact,’ establishing that ‘but for’ the infringement, he would have made additional profits.” Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1349 (Fed.Cir.1999) (citing King Instruments Corp. v. Perego, 65 F.3d 941, 952 (Fed.Cir.1995)). The appropriate framework is provided by Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir.1978). Under Panduit, “[t]o obtain as damages the profits on sales he would have made absent ... infringement, ... a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.” Id. Here, the parties contest the second factor. Ar-threx, Inc. (“Arthrex”) argues that Smith & Nephew Inc. (“S & N”) failed to meet its burden as to the absence of acceptable non-infringing substitutes. In that respect, patentee S & N bore the burden at trial “to show a reasonable probability that [it] would have made the asserted sales ‘but for’ the infringement.” Grain Processing, 185 F.3d at 1349 (citations omitted). “Reconstructing the market ... requires the patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.” Id. at 1350.
II
All of the asserted claims are to methods where a suture anchor is pressed into a *992 bone, and the resilience of the anchor holds it in place in the bone. This method contrasts, for example, with using a screw-in anchor or a toggle-fit anchor. Here the issue is whether types of anchors that do not have the features of the patented methods (i.e., screw-in and toggle-fit anchors) are acceptable substitutes for the push-in anchors of the patented methods.
At trial, S & N presented expert testimony by Richard Troxel that S & N was entitled to a lost profits award as a result of lost sales. Troxel testified that lost profits were properly calculated by looking only to a market of products containing the patented features. Troxel defined the relevant market as suture anchors “inserted by a push-in or tap-in procedure — as contrasted ... to a screw-in or a toggle fit,” “preloaded with a suture,” and “pre-mounted on an inserter.” J.A. 18715. In other words, he excluded anchors which screw in or toggle fit. Troxel testified that he limited the market to only devices with those characteristics because “it seem[ed] to [him] that a surgeon has to make a specific decision as to the anchor ... that he or she is going to use in a particular procedure” and that “it seems to be a very explicit decision by the surgeon as to which item is appropriate for that particular surgery in that particular patient.” J.A. 18716. Based on market share, Trox-el calculated that, using the year 2008 as an example, S & N would have made 87.5 percent of Arthrex’s sales of the accused devices, had Arthrex not infringed. The jury verdict awarded the amount of lost profit damages that Troxel calculated, and judgment was entered against Arthrex for that same amount. If other non-infringing alternatives had been considered, S & N’s market share would have been reduced below that which Troxel calculated for a given year.
The problem is that Troxel had no basis for excluding screw-in and toggle-fit anchors. Troxel admitted that he “did not speak to any surgeons,” and that he did not conduct any surveys of surgeons. J.A. 18797. He further stated that he did not “recall any literature that ever addressed [the] issue” of what type of anchor a surgeon would turn to if the surgeon were unable to purchase the accused product. J.A. 18798. Troxel testified that he had not studied what the market would have been like were the infringing device never introduced, stating, “that would be completely a speculation.” J.A. 18781.
Ill
The majority appropriately does not rely on Troxel’s testimony as supporting the absence of non-infringing alternatives. Rather, the majority relies on the testimony of fact witnesses, which it says shows that “surgeons chose anchors based on their insertion methods (and therefore that only press-in anchors were acceptable, non-infringing alternatives here)....” Maj. Op. at 988. But these witnesses did not testify that a surgeon would not substitute a screw-in anchor or a toggle anchor had the infringing product not been on the market.
Much of the testimony that the majority relies on only establishes that, for certain surgeries, some surgeons may prefer a toggle-fit or screw-in anchor over a press-in anchor. This hardly shows that toggle-fit or screw-in anchors are not substitutes for press-in anchors. By contrast, the evidence addressing why surgeons would choose a press-in anchor over other types of anchors is meager. Mr. Mahoney, the patentee’s Director of Medical Education, only described the various characteristics of the different types of suture anchors, stating that S & N’s product is the closest competitor of Arthrex’s infringing product, *993 that screw-in devices were not competitive products, and that a toggle product “would be closer than the screw-in, but ... not a direct competitor.” J.A. 18649. This type of conclusory testimony is exactly what Grain Processing held to be insufficient. 185 F.3d at 1350. S & N’s witness Dr. Diduch, an orthopedic surgeon, merely stated that he would consider the type of surgery being performed when choosing the type of anchor to use and that different types of anchors have advantages and disadvantages. And Arthrex’s witness, Mr. Benavitz, testified only that some surgeons prefer push-in anchors, some prefer screw-in anchors, and some prefer either type, and that the accused infringer launched the infringing product so that surgeons would have their choice of what to use. Indeed, Benavitz testified that the different types of anchors — screw-in anchors, toggle anchors, resilient anchors, and push-in anchors — all compete with one another and are used for the “same indications” and that he had “seen cases where a surgeon will use two different types of anchors in the same case.” J.A. 19250-51. While witness testimony may suggest that some individual surgeons may prefer press-in anchors in certain circumstances, there was no attempt to quantify what proportion of surgeons would not choose a screw-in or toggle-fit anchor. None of the testimony establishes under the Grain Processing standard that the market for alternatives should be limited to devices having the patented features.
To the contrary, Arthrex’s expert Dr. Greenleaf testified that “the insertion method isn’t particularly important. What’s important is that the anchor do its job.... The mechanism of that per se isn’t particularly important.” J.A. 19198. There was also evidence from fact witnesses that other types of anchors could serve as substitutes for the infringing push-in suture anchor. Arthrex’s witness Mr. Carlozzi testified that “[i]n a clinical setting, whether you tap [i.e., push in an anchor] or screw it in, it really doesn’t matter, as long as once it’s in, it stays there and holds into the bone.” J.A. 19314. Dr. Warren, S & N’s witness, testified that if he could not use S & N’s push-in product, he might use the push-in anchor of another brand, or he “might use somebody else’s screw-in device.” J.A. 19309-10. He also stated that, while he liked using S & N’s push-in product, someone could use a screw-in anchor and “wouldn’t have any problem with it” because “[t]here is more than one way to skin a cat.” J.A. 19308. S & N’s own documents indicate that it saw its primary competition as coming from a toggle anchor and a screw-in anchor. Cases like Standard Havens Products, Inc. v. Gencor Industries, Inc., 953 F.2d 1360, 1373 (Fed.Cir.1991), do not suggest that evidence of competing products is irrelevant. Standard Havens merely holds that “if purchasers are motivated to purchase because of particular features available only from the. patented product, products without such features — even if otherwise competing in the marketplace — would not be acceptable infringing substitutes.” Id.; see also Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1373 (Fed.Cir.2008) (quoting Standard Havens for the same proposition).
The majority also relies on the fact that the patented product was purchased, stating that “actual market behavior of ... surgeons determined where those surgeons would have taken their business if they could not have purchased what they in fact bought.” Maj. Op. at 987. But the fact that surgeons purchased the infringing anchor cannot establish the absence of non-infringing alternatives. The Panduit factor pertaining to non-infringing substitutes recognizes that, even where consum *994 ers have purchased the infringing device, those consumers may have chosen a non-infringing alternative were the infringing device not on the market.
To limit the market to devices containing the patented features, S & N had the burden of. showing that buyers specifically want a product having the advantages of the patent. See Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1458 (Fed.Cir.1991). It failed to meet its burden at trial and with respect to the supplemental damages calculation. Because S & N failed to meet its burden on the lost profits issue, I respectfully dissent.
I join the majority opinion with the exception of the majority’s decision sustaining the lost profits award.