**DSU MEDICAL CORPORATION, Medisystems Corporation, Plaintiffs,**

v.

**JMS CO., LTD, JMS North America Corporation Defendant.**

No. C–99–2690–DLJ, C–00–1826–DLJ.

United States District Court, N.D. California.

Oct. 31, 2003.

William J. O'Brien and Paula E. Ambrosini, O'Melveny & Myers LLP, Los Angeles, CA, for Plaintiffs DSU Medical Corp. and Medisystems Corp.

Vincent J. Belusko, Martin M. Noonen, Lee D. Hwang, Brooks M. Beard and Robert S. McArthur, Morrison & Foerster LLP, Los Angeles, CA, for Defendants JMS Co. Ltd., JMS North America Corp. and ITL Corporation PTY Ltd.

## ORDER

JENSEN, District Judge.

On September 10 and 12, 2003 the Court conducted a *Daubert–Kumho* "gatekeeper" hearing as to the proffered expert testimony of plaintiff's witness Dr. Robert Degnan. William O'Brien of O'Melveny and Myers appeared for the Plaintiffs, Vincent Belusko appeared for the Defendants. As a result of the hearing the Court enters the following order.

### I. *BACKGROUND AND PROCEDURAL HISTORY*

United States Patent No. 5,211,311 (the '311 patent) was issued on May 12, 1992 and is owned by DSU Medical Sys-

tems Corp. (DSU). The '311 patent was invented by David S. Utterberg (Utterberg) and Neil J. Sheehan. Utterberg is the sole owner of DSU and a related entity, Medisystems Corp. (Medisystems). Medisystems is a manufacturer and distributor of medical products including commercial embodiments of the '311 patent.

The '311 patent relates to needle guards—devices which are combined with needles used in medical procedures. When health care professionals use hollow-bore needles to carry out various procedures involving blood, there is a risk of accidental needle sticks. Focus on this risk has grown with the onset of AIDS. Needle guards are devices attached to the needle sets themselves designed to prevent accidental needle sticks.

Needles used in medical procedures vary in size. Small-bore needles are used in routine blood withdrawal procedures. In special procedures such as hemodialysis, large-bore needles are used. In the small-bore needle market, DSU licensed its patented technology to Becton–Dickinson (B–D) shortly after the patent was issued. Up to the present time, B–D has paid DSU over 21 million dollars in royalties on its license for the '311 patent. As to large-bore needles, Medisystems manufactured and marketed an Arterial–Venous Fistula (AVF) needle set called the MasterGuard for use in the hemodialysis market. This product, a commercial embodiment of the '311 patent, received FDA clearance in February 1994. Since its introduction, over 120 million MasterGuards have been sold by Medisystems to a dozen commercial customers. The largest customer has been Fresenius USA Manufacturing, Inc. (Fresenius) who purchased MasterGuards for use in its own dialysis clinics and for resale to hospitals and other users.

Medisystems and Fresenius entered into a contract for sales of AVF safety needle sets in January 1993. The contract was for a term of five (5) years with subsequent renewal terms of three (3) years. The contract also required Fresenius to purchase a specified amount of needle sets at a specified price each year. Although the contract contemplated an annual review of purchase volume and price, it appears that a price of six (6) cents for each needle guard remained unchanged throughout the life of the contract. The contract also provided that either party could withdraw if it provided notice at least one year before the contract term expired. The contract was renewed after five (5) years, but in October 1999 Fresenius gave notice that it would not renew after the existing three (3) year term expired. The contract was terminated on January 4, 2001. Although the parties entered into negotiations as to the possibility of entering a new contract, no agreement was reached and there has been no contract between the parties since that time.

The focus on the problem of accidental needle sticks led to legislative action. In July 1999, California became the first state to mandate the use of needle safety devices. At the national level legislation mandating the use of needle safety devices was enacted in 2000 and became effective on April 18, 2001.

In 1999 an Australian company, ITL Corp. PTY Ltd. (ITL) developed a needle guard which it called the Platypus. The device was displayed at a Baltimore trade show in April 1999 and received FDA clearance May 10, 1999. In June 1999 a large medical supply business, Japan Medical Systems Co. (JMS), began purchase of Platypus needle guards from ITL. The ITL Platypus needle guard is a "stand alone" product—a small configured piece of plastic—unattached to any other device. JMS began resale of this stand alone de-

vice to customers in the United States in November 1999. JMS also combined the Platypus needle guard with AVF needle sets and sold the combined safety needle sets to customers around the world. Sales to U.S. customers began in February 2000. Sales promotions and consumer services for these U.S. sales were handled by a wholly owned subsidiary of JMS, Japan Medical Systems Northern America (JMSNA) which was headquartered in the U.S. By April 2001 all activities related to Platypus sales to U.S. customers were transferred from JMS to JMSNA.

After the contract between Fresenius and Medisystems was terminated in January 2001, and after negotiations between Fresenius and Medisystems failed to produce a new contract, Fresenius entered into a contract with JMSNA in April 2001. This contract was for a term of two (2) years and provided that Fresenius would purchase a specified volume of Platypus needle safety products at a specified price from JMSNA. As of the time the contract was entered, DSU had filed this lawsuit claiming infringement of the '311 patent by the Platypus. At the same time JMS separately agreed to contractually indemnify Fresenius for any liability connected to its purchase of the Platypus.

The Fresenius–JMSNA contract also contained provisions related to another wholly separate needle guard called the WingEater. This needle guard was developed and manufactured by JMS. A WingEater protocol was shown to Fresenius in October 2000, an application for FDA clearance was made in February 2001, and the WingEater was cleared by the FDA on June 20, 2001. The Fresenius–JMSNA contract provided that the needle guard product sold by JMSNA under the contract to Fresenius could be shifted from the Platypus to the WingEater starting at the time period August 2001 to December 2001 upon approval by Fresenius. Actual sales of the WingEater to Fresenius began in December 2001 and by the second year of the contract the WingEater had substantially replaced the Platypus as the needle guard product sold under the Fresenius–JMSNA contract. The specific unit sales were as follows:

| Contract Year | Platypus | WingEater |
|---|---|---|
| 2001–2002 | 24,473,700 | 4,151,400 |
| 2002–2003 | 5,128,000 | 27,919,100 |

DSU filed this infringement lawsuit in April 1999 in the Northern District of Illinois. JMS filed a reciprocal declaratory relief action as to the '311 patent in the Northern District of California in June 1999. The Illinois case was subsequently transferred to this District and the cases have been consolidated. Extensive pre-trial litigation has taken place, including a Markman claim construction hearing and reciprocal Motions for Summary Judgment. Claims of the '311 patent cover both stand alone needle guards and needle guards in combination with needle sets. The Court has found that the Platypus does not infringe the combination claims of the '311 patent or the stand alone claims of the '311 patent when it is an "open" configuration, but that it does infringe the stand alone claims of the '311 patent when it is in a "closed" configuration.

In the course of the final pre-trial preparations for trial in this matter, the Court has now conducted a *Daubert–Kumho* gatekeeper hearing as to the proposed expert testimony of DSU witness Dr. Stephen A. Degnan. This testimony is offered on the issue of patent infringement damages. Dr. Degnan is a Certified Public Accountant with a Doctorate in Finance, extensive experience in financial matters related to patents and other intellectual properties, and extensive experience as an expert witness in federal and state courts on damages issues. The gatekeeper issues as to the proffered testimony of Dr. Degnan do not relate to the general area of expertise

as to patent damages or to his status as a qualified expert but, rather, to the specifics of his testimony.

The gatekeeper issue which the Court believes should be examined is as to his testimony on lost profits. The Court will fully explore this issue in the body of this order, but will describe the proffered testimony by summary at this point. Dr. Degnan starts his consideration of lost profits damages by reference to the traditional *Panduit* factors, (1) a demand for the patented product, (2) the absence of acceptable noninfringing substitutes, (3) its capacity to exploit the demand, and (4) the profits lost due to the infringement. *See, Panduit Corp. v. Stahlin Bros Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978). In his opinion, DSU has satisfied each of the factors.

In order to establish the profits that Medisystems would have made "but for" the infringement, Dr. Degnan engages in a hypothetical reconstruction of the relevant market as it would have developed absent the infringing product, as authorized by, *e.g., Grain Processing Corp. v. American Maize–Products Co.,* 185 F.3d 1341 (Fed. Cir.1999). After considering the hypothetical market circumstances in the absence of a Platypus product, Dr. Degnan presents this core opinion in his report,

> "But for the presence of Platypus in the market, and in order to sustain operations in their dialysis clinics, as well as satisfy their customer base, Fresenius would have been required to enter into a contract with Medisystems in the November 2000 to February 2001 time period."

Dr. Degnan offers the further opinion that this contract would be for a term of four (4) years and that the price per needle guard unit in the hypothetical contract would be at fourteen cents rather than the six cents per unit price paid under the pre-existing contract. Dr. Degnan based his opinion as to the length of the contract and the price per unit on the circumstance that Medisystems, in the course of negotiations for a new contract after Fresenius' notice of termination, had proposed these terms to Fresenius on November 14, 2000. Dr. Degnan recognized that in the real world that proposal had been rejected by Fresenius, but opined that in the hypothetical world Medisystems would have had a monopoly position as to AVF needles and would have used its monopoly power in the context of the upcoming U.S. mandate for safety needles to "require" Fresenius to enter the hypothetical contract he describes. Dr. Degnan then derived a profit per unit figure from the price per unit of the hypothetical contract and Medisystems' data showing its costs per unit. Dr. Degnan then multiplied the profit per unit by the number of needles sold by JMSNA to Fresenius under their April 2001 contract to arrive at a total of $21,884,160 for what he described as, "Medisystems 'Lost Profits on JMS' taking of the Fresenius contract April 2001 to September 2003." The JMSNA needle sales used by Dr. Degnan in this calculation included all the sales of the infringing Platypus and all the sales of the noninfringing WingEater by JMSNA to Fresenius. Dr. Degnan testified that he used the WingEater sales for his damages calculation on the basis of the legal doctrine of "accelerated market entry". DSU has cited *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 687 F.Supp. 134 (S.D.N.Y.1988), as the "leading" case on this legal principle. Finally, Dr. Degnan opines that based upon the yet to be completed four (4) year term of the hypothetical contract, Medisystems will suffer additional lost profits damages in the amount of $13,200,000. DSU argues that these damages are now due and payable because of the existence of the hypothetical contract whether or not JMSNA makes

any future Platypus or WingEater sales to Fresenius.

## II. *LEGAL STANDARD*

### A. *"Gatekeeper" Function Under Daubert*

In *Daubert v. Merrell·Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set out an analytical framework for district courts to determine admissibility of expert testimony under Federal Rules of Evidence sec. 702. Prior to *Daubert*, district courts decided admissibility of expert testimony based on the "general acceptance" test set forth in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). To be admissible, the "general acceptance" test required that scientific principles relied upon by experts "be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. *Daubert* held that the Federal Rules of Evidence, specifically Rule 702, superseded the "general acceptance" test. As such, the Court formulated an analytical framework stemming from its interpretation of Rule 702.

Rule 702 places limits on the areas of expertise and the methodologies of analysis which may be covered and used by an expert witness. In response to *Daubert*, the Rule was amended in 2002 to better aid trial judges in assessing reliable expert testimony. That rule now provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. *Daubert* established a "gatekeeper" role for the trial court to act as the preliminary adjudicator of whether or not the proffered expert evidence was admissible. Accordingly, the trial judge must act as "gatekeeper" to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology can .properly be applied to the facts at issue." *Daubert*, 509 U.S. at 592–593, 113 S.Ct. 2786. The *Daubert* Court provided non-exclusive factors to aid trial judges in that determination, including:

(1) whether the scientific theory or technique can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) whether there is a known or potential error rate; and

(4) whether the theory or technique is generally accepted in the relevant scientific community.

*Daubert*, 509 · U.S. at 592–594, 113 S.Ct. 2786.

 The *Daubert* factors are not limited to testimony regarding strictly scientific knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (concluding that *Daubert* applies to "scientific, technical, or other specialized knowledge"). Although the expertise at issue in *Daubert* involved scientific theories, it is the word "knowledge" in Rule 702, and not the words modifying it, (such as scientific, technical or specialized), which "establishes a standard of evidentiary reliability." 509 U.S. at·589–590, 113 S.Ct. 2786. Thus, trial judges are responsible for determining whether the knowledge of the expert, whether scientific, technical, or specialized, is based upon the application of reliable theories or techniques. The proponent of the testimony must establish admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171,

175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

■■■ Furthermore, the factors listed in *Daubert* were not intended to be exhaustive nor applied to every case. *See Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167 (explaining that the factors are meant to be "helpful, not definitive."). In cases involving non-scientific testimony, the district courts may consider the *Daubert* factors in assessing the reliability of the proffered expert testimony, but they are not limited to those factors in determining reliability. *Id.* at 150–151, 119 S.Ct. 1167. District courts have broad discretion in determining both how to assess reliability and whether reliability exists. *Id.* The factors the Court should consider in deciding how to make this determination will depend on the specific nature of the testimony to be presented and the facts of the particular case. *Id.* At least one court has noted that the *Daubert* factors may be particularly inapplicable when evaluating expert testimony on business transactions. *See ProtoComm Corp. v. Novell Adv. Servs., Inc.*, 171 F.Supp.2d 473, 477 (E.D.Pa.2001) (noting that the *Daubert* "factors were devised in the context of testing the reliability of scientific methods of proof and do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions").

■■ Although trial judges enjoy broad discretion when determining the reliability of expert testimony, the "gatekeeper" function is limited. In determining the evidentiary reliability, the trial judge is limited to considering the methodologies relied upon by the expert, not the conclusions reached by the expert. *U.S. v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993) (quoting *U.S. v. Brown*, 557 F.2d 541, 556 (6th Cir.1977)). It is not the trial court's role to determine whether the expert's conclusions are actually correct. 4–702

Weinstein's Federal Evidence § 702.05. The certainty of the scientific results are matters of weight for the jury. "[A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (citations omitted). As well, the district court is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence...," *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003), nor is it to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir.2002). Its sole purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion. *Daubert*, 509 U.S. at 592–593, 113 S.Ct. 2786.

■■ However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 147, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). A trial court may exclude evidence when it finds that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

In *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed.Cir.2003), the Federal Circuit faced facts loosely similar to those presented here. Defendants filed a motion in limine to exclude plaintiff's expert testimony regarding damages alleging that the expert relied on "insufficient facts or data" and "unreliable methodology." *Id.* at 1392–93. As to the argument that the expert relied on insufficient facts, the court concluded that "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Id.* at 1392. Similarly, as cited

approvingly by the Court, the Advisory Committee note to Rule 702 explains that the amendment on " 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." As such, the court held that, when the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts. The proper way for a party to challenge an expert in such a situation, reasoned the court, is through cross-examination of the expert. *Id.* Therefore, the court ruled that the trial court properly rejected defendant's argument. *Id.*

In contrast, the Court's discussion of whether the expert relied on "unreliable methodology" involved an analysis of the underlying legal principles of patent damages law. *Id.* at 1393. In the context of computing reasonable royalty damages, the Court noted that it had "endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer ... " *Id.* at 1393 (citations omitted). Thus, the Court reviewed the expert's testimony to determine whether he had "properly applied the accepted [factors]" outlined in the framework to the disputed facts. *Id.* The Court held that, in applying those factors, the expert was not legally erroneous in his methodology to compute reasonable royalty damages. *Id.* at 1394.

*Micro Chemical* is instructive because it distinguishes between the trial court's factual review, which is generally outside the role of the trial court, and review of the legal methodology underlying an expert's opinion which is within the role of the trial court. Reliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable.

### B. Method for Determining Infringement Damages

#### 1. Reasonable Royalty

Title 35 U.S.C. § 284 provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284 (2002).

■ The generally approved approach to determining a specific royalty in a specific case is by way of the hypothetical negotiation process described by cases such as *Micro Chemical, supra.*

#### 2. Lost Profits

■ Lost profit damages are an assessment of actual damages (the profits the patentee lost due to the infringement). In the event that lost profits cannot be calculated, reasonable royalty damages represent the floor of possible damages under § 284. *See Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1445 (Fed. Cir.1990). In order to recover lost profit damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales. *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed.Cir.1989). However, the patent holder does not have to negate every possibility of the purchaser deciding to buy a different product or foregoing the purchase altogether. *See id.* To obtain as damages the profits on sales a patent owner would have made absent the infringement, I. e., the sales made by the infringer, the owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to

exploit the demand, and (4) the amount of the profit he would have made. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978).

### 3. *Prohibition Against Double Recovery*

A patent owner may recover lost profits damages or a reasonable royalty on each infringing sale, but not both. *See Crystal Semiconductor Corp. v. Tri-Tech Microelectronics Intern., Inc.,* 246 F.3d 1336, 1354 (Fed.Cir.2001). A patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate "but for" causation and reasonable royalties for any remaining infringing. *See King,* 65 F.3d at 952–53.

### III. *DISCUSSION*

The Court believes that there are four substantive areas relevant to the proffered expert testimony that should be reviewed: 1) *Panduit* factors; 2) the principles of accelerated market entry theory; 3) the scope of patent damages; and, 4) issues of the admissibility of expert testimony.

### A. *Panduit Factors*

In the opinion of Dr. Degnan, the second *Panduit* factor, "the absence of acceptable noninfringing substitutes," has been satisfied by plaintiff. He first describes the "relevant time period" as the time between March 2000, when JMS began sale of its infringing Platypus in the U.S., and October 2000 when JMS delivered its first non-infringing WingEater needle guard to a U.S. customer. Dr. Degnan states that only anti-needle stick products which had received FDA clearance and were being sold in the U.S. during this time period were the Diasol Shelly and the Nipro Safe-Touch.

Dr. Degnan believes that the Shelly does not defeat the second *Panduit* factor because it did not have a full range of needle guard products, was not sold to medical distributors such as Medisystems, and that it had been rated as "unacceptable" by an independent rating agency.

The Nipro was deemed to be a product which did not defeat the second *Panduit* factor because it had not been delivered until after the Medisystems–Fresenius contract had been terminated, there was insufficient production capacity for the product, the product had been recalled for safety reasons, and that the product was therefore non-acceptable by Fresenius. The undisputed facts show that the Nipro was on the market as a noninfringing substitute for a portion of the "relevant time period." Dr. Degnan does not discuss any possible impact of these facts on his analysis of the second *Panduit* factor.

The WingEater had received FDA clearance during the "relevant time period" but was not considered by Dr. Degnan to be an issue as to the second *Panduit* factor apparently because it had not been delivered to customers during that time period. As will be discussed *infra*, the *Grain Processing* case explains that the "availability" of an acceptable noninfringing products can trigger preclusion of lost profits even though the product is not on the market during the period of infringement. Dr. Degnan does not discuss this issue.

The great bulk of the infringing sales of the Platypus and of all the noninfringing sales of the WingEater used to establish a measure of lost profits take place after the "relevant time period" is ended. There is no analysis of the timing or impact of these sales on the *Panduit* second factor conclusion.

The issue before the Court is whether or not Dr. Degnan can present his opinion testimony on the second factor required by *Panduit.* This seems to fall

clearly in the area where the testimony should not be excluded. The testimony should be introduced, cross-examined, and then the factual issue should be presented to the jury. It may be that after the evidence has been presented, the undisputed facts will show that the second *Panduit* factor does not exist. That determination cannot be made at this juncture and it appears to the Court that Dr. Degnan's testimony as to this factor is admissible.

### B. *Accelerated Market Entry*

 Plaintiff claims that it can recover lost profits based on its lost sales from the JMSNA sales of the noninfringing WingEater product. Plaintiff relies on what it describes as the "well recognized" and "well accepted" patent damages principle of "accelerated market entry" set forth in the "leading" case, *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 687 F.Supp. 134 (S.D.N.Y.1988), (BIC).

In *BIC* the plaintiff, Windsurfing International Inc. (WSI), owner of a reissue patent related to sailboards, sought infringement damages from BIC Leisure Products for sales of infringing sailboard products. In pre-trial proceedings, WSI identified several lost profit damage theories including:

> "...5) projected lost profits for future competition with BIC which WSI claims will be accelerated because BIC'S infringement will allow it to reenter the market in an enhanced position ("accelerated reentry by BIC")."

687 F.Supp. at 135. BIC filed a pre-trial motion asking the Court to rule that this theory of damages should not be allowed because it would cause an extension of the benefits of a patent beyond its expiration and is impermissible as a matter of law. The trial court denied this motion and ruled that WSI would be allowed to attempt to prove damages under this theory at trial. The Court reasoned that this damage theory would not extend the patent term because it was based on *past* infringing conduct of BIC and would encompass only damages that the patent holder would have made had the infringer not infringed.

The case was subsequently tried and then appealed to the Federal Circuit at *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 1 F.3d 1214 (Fed. Cir.1993). At the trial court level, WSI was awarded lost profits damages, but this award was reversed by the Federal Circuit and the case was remanded to calculate damages on a reasonable royalty basis. The reversal was based on a finding that WSI had failed to prove that it would have actually made the sales of sailboards for which it was claiming lost profits and had, therefore, failed to establish the "but for" basis necessary for any lost profits award. There is nothing in the Federal Circuit opinion to support a conclusion that WSI ever attempted to prove any "accelerated reentry" damages from future competition with BIC in the actual trial. In fact there is no discussion whatsoever of this damages theory in the Federal Circuit opinion. Furthermore, even if one were to assume that there is some sort of legal dicta that comes out of the BIC trial court pre-trial order, it is dicta that does not apply to the facts of this case. The sales contemplated in *BIC* were sales of an infringing product which was no longer a legally infringing product because the patent had expired. There was no consideration of the factual circumstances of this case where the alleged lost profits are based on sales of an acceptable noninfringing substitute product. *BIC* is, of course, a District Court decision which is not binding precedent for this Court. It is to be considered only for its wisdom, or lack of wisdom.

Plaintiffs also cite *TP Orthodontics Inc. v. Professional Positioners Inc.*, 17

U.S.P.Q.2d 1497 (E.D.Wis.1990) in support of its accelerated market entry thesis. This case involves a patent related to "positioners" used in orthodontic procedures. After the trial court had decided that the defendant's product infringed the patent, the defendant filed a motion for partial summary judgment as to the plaintiff's "accelerated re-entry" damages theory. The trial court described the factual issue involved as one which required proof that the defendant entered the market on the day after the patent expired in an enhanced position at a level accelerated by its prior infringement. The trial court held that it was satisfied that this is an acceptable legal theory and cited *BIC* as a case where the theory has been "recognized". The Court then denied the summary judgment motion because there were remaining genuine issues of material fact. There is nothing provided to the Court that this theory was ever actually tried in the *TP* litigation or that there was ever an actual trial at all. This case does not stand as binding precedent for this Court as it is a pre-trial ruling by a sister court, and it is factually inapposite as it does not involve the use of acceptable noninfringing substitutes to establish lost profits damages.

Plaintiff also cites to the Federal Circuit *Grain Processing Corp. v. American–Maize Products., Co.*, 185 F.3d 1341 (Fed. Cir.1999) case in support of its "accelerated market entry" principle. In *Grain Processing* the patent was related to the production of maltodextrin food additives. The trial court awarded the patent owner damages based on a reasonable royalty, but denied damages for lost profits. The trial court denied lost profits because of the presence of an available acceptable noninfringing substitute. The noninfring-

ing substitute had not been actually introduced in the market, but the trial court ruled that it was "available" because the evidence established that it could have been produced during the time of the infringement. The Federal Circuit affirmed the ruling of the trial court. The Court explained that proof which only established *theoretical* availability would not preclude lost profit damages, but that proof of availability *in fact* was sufficient to preclude.

In the course of its opinion the Federal Circuit discussed the use, with "this Court's approval," of market reconstruction theories by patentees to show the ways they would have been better off in the "but for world" and accordingly to recover lost profits in a "wide variety of forms." The Court then set out a "*See, e.g.*" list of such theories which included the *BIC* cite for "accelerated market re-entry." *Id.* at 1350. There is no further discussion of *BIC* and there is no discussion of a holding in *Grain Processing* that relates to the "accelerated market re-entry" damages theory. What we have then is *Grain Processing* dicta about *BIC* dicta.

In sum, none of the cases cited by Plaintiff, to support a thesis of "accelerated market entry"[1] for lost profits, involve a case where a trial court has actually awarded lost profit damages using that thesis. There is no case where an appellate court has ever considered or accepted any such award. The cases do include pre-trial rulings which apparently accept such a theory but they do not create binding legal precedent for this Court. It may be argued that even though the cases are not "precedent," they may yet be considered as persuasive legal dicta to inform necessary decisions of the court in this case. The force of that argument, howev-

---

1. The Plaintiff uses the word "entry" although all the cases cited use the word "re-entry." In light of the Court's ruling on this issue, it is not necessary to pursue the question of the significance of this difference.

er, is virtually eliminated when the dicta is based on facts which do not exist in the instant case. The legal context, then, is that plaintiff's proposed methodology of establishing lost profits based upon sales of acceptable noninfringing substitute products is wholly unprecedented. The best description of how the Court can decide this dispute as to lost profits is in *State Indus., Inc. v. Mor–Flo Indus. Inc.,* 883 F.2d 1573, 1576 (Fed.Cir.1989), where the Court in discussing the issue of lost profit damages states that, "... the methodology of assessing and computing damages is committed to the sound discretion of the District Court."

### C. Patent Damages as a Matter of Law

One of the sections in Plaintiff's Trial Memorandum is entitled,

"Recovering for Damages Caused by Sales of Non–Infringing Product Under the Accelerated Market Entry Principle and Ordinary Tort Law Concepts of Forseeability."

In this section, to set the legal stage, Plaintiff includes the following quote

"Full compensation includes any foreseeable lost profits the patent owner can prove. *Grain Processing,* 185 F.3d at 1349 (citing *Rite–Hite,* 56 F.3d at 1545–1547)."

The Court agrees that *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538 (Fed.Cir. 1995), is an important contribution to the jurisprudence of damage awards in patent cases and should be fully discussed.

*Rite Hite* is an en banc decision of the Federal Circuit with an extensive discussion of the law of patent damages. The Plaintiff, Rite Hite, owned a patent (the '847) on a mechanism for restraining trucks to loading docks during loading and unloading. The defendant Kelley produced and distributed a competing restraining mechanism called the "Truk-

Stop" which was found to infringe the '847 patent. Rite Hite sold two types of truck restraint mechanisms. One, the "Manual Dok–Lok Model 55" (MDL–55) incorporated the invention covered by the '847 patent. The other, the "Automatic Dok–Lok Model 100" (ADL–100) was not covered by the '847 patent. In calculating lost profit damages from the sale of infringing Truk-Stop products the trial court allowed Rite–Hite to capture the lost profits from the lost sales of both the MDL–55 and the ADL–100. Kelley appealed claiming that sales of the ADL–100 do not constitute an injury that is legally compensable by means of lost profits. Kelley argued that in order to receive lost profits a patent owner must prove that "but for" the infringement it would have sold a product covered by the patent. A majority of the Judges of the federal Circuit affirmed the trial court and allowed lost profits damages from the lost sales of both the MDL–55 and the ADL–100.

Although the Judges disagreed as to the specific outcome in the *Rite–Hite* case, there was no disagreement as to the following underlying principles.

First, the Court held that "whether the lost profits at issue are legally compensable is a question of law, which we review de novo." *Id.* at 1544. It follows, of course, that this is also a question of law for the trial court in the first instance.

Second, this is not a case where damages are based upon the sale of an acceptable noninfringing substitute. The Court pointed out that the ADL–100 belonged to Rite–Hite. Rite–Hite would not have lost ADL–100 sales to a third party, and it was, therefore, not an acceptable noninfringing substitute. *Id.* at 1548. The Court observed that, "*Rite–Hite* is not attempting to exclude its competitors from making, using, or selling a product not within the scope of its patent." *Id.* at 1547.

The Truk–Stop mechanisms sold by the defendant Kelley infringed the '847 patent and the damages sought were based upon sales of that infringing product which caused lost sales of Rite–Hite's products. The Court further observes that,

"Allowing compensation for such damage will "promote the Progress of ... the useful Arts" by providing a stimulus to the development of new products and industries. *See* 1 Ernest B. Lipscomb III, *Walker on Patents* 65 (3d ed.1984) (quoting Simonds, *Summary of the Law of Patents* 9 (1883)) ("The patent laws promote the progress in different ways, prominent among which are by protecting the investment of capital in the development and working of a new invention from ruinous competition till the investment becomes remunerative")." *Id.* at 1547.

Third, to be compensable, damages in a patent case must meet both a "but for" test and a "legal" test. The *Rite–Hite* majority states:

"Preliminarily, we wish to affirm that the 'test' for compensability of damages under § 284 is not solely a 'but for' test in the sense that an infringer must compensate a patentee for any and all damages that proceed from the act of patent infringement." *Id.* at 1546.

For jurisprudential context the Court cites Keeton:

In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for the wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' As a practical matter, legal responsibility must be limited to those causes which are so closely related with the result and of such significance that the law is justified in im-

posing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy. W. Page Keeton, et al. *Prosser and Keeton on the Law of Torts* § 41. (5th ed.1984) (citations and footnote omitted). *Id.* at 1546.

To put this in the patent context the Court holds,

"...along with establishing that a particular injury suffered by a patentee is a "but for" consequence of infringement, there may also be a background question whether the asserted injury is of the type for which the patentee may be compensated." *Id.* at 1546.

The "background question" for this case, then, is whether or not the sale of an acceptable noninfringing substitute can cause an injury of the "type" for which patent damages may be awarded.

The dissent in *Rite–Hite* presents an extensive analysis of the law of patent damages. Like the majority the dissent points out that, "patent damages" are limited to legal injury to property rights created by the patent, not merely causation in fact." *Id.* at 1559. In deciding the question of what is a "legal injury" the Court refers in the first instance to the well-accepted common law rules, such as "proximate cause", which are used to limit the further reach of "but for" causation in any analysis of damages. Next, the *Rite–Hite* dissent points out that,

"In connection with a tort created by a federal statute, the public purpose of the statute and the likely intent of Congress are the overriding considerations respecting the types of injuries for which damages may be legally awarded." *Id.* at 1560.

The *Rite–Hite* majority acknowledges the "explication of established patent law principles" as to the judicial limitations of dam-

ages made by the dissent and then describes its difference with the dissent:

"The dissent's disagreement thus centers not on whether lines are drawn regarding the compensability of damages, but only on where those lines are to be drawn." *Id.* at 1546.

The *Rite–Hite* majority draws its line by limiting "but for" damages to those injuries which are reasonably, objectively foreseeable to the infringer. In the *Rite–Hite* case the defendant sold its infringing Truk-stop product with the full knowledge that the Truk-stop was in competition with both the Rite–Hite MDL–55 and the ADL–100. Under these circumstances the *Rite–Hite* majority allowed 'capture by the patentee' of lost sales of both its products even though only the MDL–55 was covered by its patent. The *Rite–Hite* dissent would draw the line to exclude the ADL–100 lost sales arguing that the majority is doing nothing more than applying closer scrutiny to the causation in fact "but for" test.

 This Court is of course bound by the *Rite–Hite* majority. The question is then, how does the *Rite–Hite* decision relate to the sales lost to the WingEater product in this case? To begin, the facts of *Rite–Hite* are not the same as the facts in this case. The Rite–Hite Truk-stop infringes the '847 patent, in contrast to the WingEater which does *not* infringe the '311 patent at issue in this case. Nevertheless, the argument could be made that *Rite–Hite* applies to this case as a legal precedent, because it is "foreseeable" that the WingEater will cause Rite–Hite to lose sales of its MasterGuard. This argument expands *Rite–Hite* beyond any limit of patent law. Of course a WingEater sale can replace a MasterGuard sale. It competes in the same market, that is why it is a noninfringing *substitute*. The *Rite–Hite* majority did not intend to eliminate the patent law concept of the acceptable nonin-

fringing substitute. To the contrary, the Court made it clear that the ADL–100, the infringing substitute product, "was ... not an 'acceptable non-infringing substitute' within the meaning of *Panduit...*" *Id.* at 1548. The concept of "foreseeability" can not be used to simply eliminate that fundamental doctrine of patent law. *Rite–Hite* applies to the question of foreseeability in the market place, but the concept of foreseeability does not at the same time answer the question of whether the specific injury involved is a legally compensable injury under the patent law. Although JMSNA could "foresee" that its sales of its WingEater could cause loss of sales of the patented MasterGuard, it could not, with any reasonable vision, "foresee" that this lawful competition could be transformed into a compensable injury under the patent laws. *See Id.* at 1571. Pursuant to *Rite–Hite* it is the responsibility of this Court to answer the question of whether or not this is a legally compensable injury as a matter of law.

Consideration of this issue requires the Court to look at the patent law itself and to existing precedent on the issue.

The Supreme Court has explained that inventors have rights to make, use, and sell their inventions and that a patent augments that natural right by making it exclusive for a limited time. The patent laws create a property right in the inventor, "...to preclude others from interfering with the patentee's exclusivity in providing the patented goods to the public." *Crown Die and Tool v. Nye Tool and Machine Works,* 261 U.S. 24, 34, 43 S.Ct. 254, 67 L.Ed. 516 (1923).

Under the law, the quid pro quo for the patent is that the inventor must make full disclosure of the invention. The purpose of the disclosure is to teach others the invention in order to stimulate the growth

of new products. The *Rite–Hite* Court explains:

> "The patent system was not designed merely to build up a library of information by disclosure, valuable though that is, but to get new products into the market place during the period of exclusivity, so that the public receives full benefits from the grant."

*Id.* at 1562. Our patent laws, then, not only recognize that noninfringing substitute products may lawfully compete with patented products during the term of the patent, but are designed to encourage the growth of such products. Any disincentive to the growth of such new products is in conflict with this public policy.

Plaintiff seeks to recover lost profit damages in this case based upon the sale of an acceptable noninfringing substitute product. To this Court, that theory of damages is a clear cut disincentive to new growth and is in direct conflict with a fundamental policy of our patent laws.

In two areas of substantive law comparable to the area of patent law—antitrust and RICO—the Supreme Court has limited available statutory tort damages by reference to the purpose for which the laws were enacted. In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Court stated,

> "[Plaintiff under section 7 of the Clayton Act] must prove more than injury casualty linked to an illegal presence in the market. Plaintiff's must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent."

In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Court stated,

> "[A] showing [must be made] not only that the defendants violation [of RICO] was a 'but for' cause of [the plaintiff's]

injury, but was the proximate cause as well. [As further explained] proximate cause [is used] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."

 This Court is satisfied that the same principles apply to the patent laws and that only those injuries consistent with the purposes of the patent laws should be considered to be legally compensable. As a result of this analysis, the Court finds that even if asserted lost profit damages caused by the sale of an acceptable noninfringing substitute can be said to fall within the reach of "but for" causation, they are not patent injuries legally compensable under the patent law.

Although there are no cases to be found dealing with the specific patent damages issue raised in this case, existing precedent on the subject matter supports the same conclusion. The second *Panduit* factor requires a plaintiff asking lost profit damages to prove "the absence of acceptable non-infringing substitutes." The necessary corollary is that the presence of non-infringing substitute precludes the recovery of lost profits. The force of this rule is made clear in *Grain Processing* where lost profits are precluded by the *presence* of an acceptable noninfringing substitute when it is *available* to the market even though it is *not on sale* in the market. The WingEater is obviously present in the market when it is actually sold, and, under existing precedent, that fact simply *precludes* recovery of lost profits.

Plaintiff obviously disagrees with the Court's conclusion that WingEater sales cannot produce lost profit damages but the basis for the disagreement is obscure. In his discussion of *Panduit* factors, Dr. Degnan includes this statement in his report:

> "The second test is the absence of an acceptable non-infringing substitute.

The relevant time period in this case starts when JMS commenced marketing and delivering its infringing Platypus JM needle guard product in the U.S., March 2000, until JMS sold and delivered its first non-infringing product, the WingEater JM in approximately October 2001."

As already discussed, Dr. Degnan opines that there was an absence of acceptable noninfringing substitutes during the "relevant time period" with the result that the second test of *Panduit* has been satisfied. What is not discussed, however, is the necessary implication of this statement is that after the WingEater entered the market in October 2001 the second *Panduit* test is *not* satisfied and that lost profits are, therefore, precluded after that date. Dr. Degnan does not discuss this *Panduit* effect in his report. In his testimony Dr. Degnan identified the legal principle underlying his calculations of lost profit damages caused by WingEater sales—after October 2001—as the legal principle of "accelerated market entry." The Court is being asked to accept a legal principle that *BIC*, along with other cases citing *BIC*, overrule the lost profits damages principles of *Panduit* and *Grain Processing*, or at least functionally overrules them by creating an exception to their otherwise applicable rule of preclusion. As already discussed, *BIC* is not factually applicable to this case, and *BIC* does not create legal precedent for the rule proposed by plaintiff.

 Accordingly, this Court finds that the plaintiff in this case cannot be awarded lost profit damages based upon any sale by the defendant of the noninfringing WingEater needle guard. In *Daubert–Kumho* "gatekeeper" terms, the proffered expert testimony supporting such damages relies upon a legal "principle" that is not legally acceptable to this Court and the testimony is, to that extent, inadmissible.

The Court also finds, that even if the law allowed patent damages based upon the sale of noninfringing substitutes in some category of cases, that this is not such a case. The proffered methodology, requiring inter alia hypothesized terms in hypothesized contracts, is not grounded on established legal principle and is far too remote factually to be within the line drawn for legally compensable patent injuries.

### D. *Expert Opinion Testimony*

 The *Daubert–Kumho* legal context and general factual setting have already been described in this order. The proffered expert witness, Dr. Richard Degnan, is qualified to present opinion testimony on the subject matter of damages in patent cases. Within this area of expertise the witness can determine the profits that would have been made by the patentee "but for" the infringement through reconstruction of the market as it would have developed in the absence of the infringing product. However, the Court may not exclude the expert testimony simply because it disagrees with the results stated by the expert. Matters of weight, credibility and ultimate fact are for the fact-finder. There is a threshold issue of admissibility, however, requiring the Court to examine the connection between the opinion proffered and the reconstructed market data. If there is a sufficient connection, the opinion is admissible with its weight to be determined by the fact-finder. However, if there is too great an analytical gap between the two, the opinion is inadmissible.

The hypothetical contract proffered by Dr. Degnan depends upon a reconstructed market—sans Platypus—which includes two basic factual conclusions. One, in order to maintain its business operations in compliance with the new Federal law, Fre-

senius must have a source of AVF safety needle sets. Two, Medisystems has a monopoly position with respect to these needle sets which it will use to "require" Fresenius to enter a purchase contract with Medisystems sometime between November 2000 and February 2001.

There are several problematic areas in Dr. Degnan's testimony. The issue of acceptable substitutes comes up again. The issue is similar but not the same as the second factor in *Panduit*. Here the existence of acceptable substitutes goes to show that there was no monopoly rather than a failure to meet the tests of *Panduit*. In his testimony, Dr. Degnan discounts the Nipro product because it was withdrawn from the market as unsafe. However, the market withdrawal took place in June 2001 and there is no factual showing that any potential customer of Nipro, including Fresenius, had any knowledge of a safety problem before that time. An accurate reconstructed AVF needle set market in the months of November 2000 to February 2001 would require recognition that the Nipro was available for sale during that time.

The availability of the WingEater as a market substitute must also be considered. The *Grain Processing* court pointed out that,

"The 'but for' inquiry requires a reconstruction of the market, as it would have developed absent the infringing conduct, to determine what the patentee 'would have made.'"

185 F.3d at 1350. The Court additionally explained that,

". . . a fair and accurate reconstruction of the "but for" market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if

available, to compete with the patent owner rather than leave the market altogether."

*Id.* at 1350–51.

The reconstructed market then must include an assessment of what JMS would have done to move up market entry and the FDA approval process if there had been no Platypus. It appears that the WingEater was "available" as of October 2000 when prototypes were shown in the market. Is it not foreseeable that steps would be taken by JMS to move up the market entry of the WingEater if that had been its only needle guard? Dr. Degnan does not consider this issue at all, choosing to review only the market as it existed rather than as it would have existed in light of projected conduct by JMS, as is required by *Grain Processing*.

There are two other market circumstances that appear to be relevant and not considered by Dr. Degnan. Off-contract sales by Medisystems to Fresenius and any existing inventory of Fresenius.

Sales of MasterGuards by Medisystems to Fresenius can be made whether or not there is a purchase contract between the parties. In fact, there is evidence that such off-contract MasterGuard sales to Fresenius did take place. If Fresenius chose not to enter into a new purchase contract at the terms proposed by Medisystems, it is not an ineluctable conclusion that Medisystems would play its hypothesized monopoly card by refusing to sell to Fresenius. Dr. Degnan does not consider the obviously negative impact on Medisystems revenue by refusing to make available MasterGuard sales to its largest AVF needle set customer. Additionally, there is also no consideration of the litigation risk to Medisystems by anticompetitive conduct in the sensitive dialysis treatment market. There is no consideration of the potential impact of any Fresenius inventory of AVF

needle sets for both aspects of Fresenius business activities—dialysis and hospital sales. In the real world, Fresenius carried out its business operations for some three and a half months without a purchase contract for either the MasterGuard or the Platypus. That fact, if for no other reason than its impact on the timing of the hypothetical contract, would seem to underscore the need to consider these economic circumstances in an accurately reconstructed safety needle market.

The final and ultimately decisive issue in Dr. Degnan's proffered expert testimony concerns his opinion as to the terms of the hypothetical contract. Dr. Degnan testified that the hypothetical contract would be for a term of four years and at a price per unit of fourteen (14) cents. Each of these terms is a significant increase over the terms of the real world just-expired purchase contract between the parties. These terms are each of a great deal more than marginal significance. The new (14) fourteen cent price per unit is said to produce some $21,000,000 in damages. If the price per unit was hypothesized to be the historical price of (6) six cents per unit, the impact on a damage award would be measured by multi-million dollar amounts. The four (4) year length of the contract causes an increase of more than 10 million dollars in damages above the damages allegedly recoverable for the allegedly tortious conduct of defendant up to the present time. The only data which is offered to support this opinion is that Medisystems proposed these terms to Fresenius during contract negotiations in November 2000. If the old contract had been renewed, the terms would have been three years with a price to be set each contract year in light of a history where the price had remained at six (6) cents for the last eight (8) years. There is no data offered as to how and why the price had remained unchanged for years. There is not data offered as to the economic foreseeability of suddenly doubling the cost of goods to Fresenius, particularly under circumstances where it is known that Fresenius has little or no power to effect the payments it will receive for dialysis services. In *Grain Processing* the court observed,

> "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement out of the economic picture." ·

185 F.3d at 1350. In the Court's view, the analytic process here lapses into speculation. If we assume that Medisystems is a monopolist, even monopolists must conform to economic reality. In the Court's view, Dr. Degnan does not supply us with sound economic data for that fundamental posit of an accurate reconstructed market.

As already described, the Court is to look at the connection between the data and the opinion offered. The data shows us that Medisystems proposed contract terms in the course of negotiations for a renewed contract which extended the previous length of the contract and more than doubled the existing price per unit, and that Fresenius rejected this proposal. The opinion offered is that sometime after this had taken place, Fresenius must have agreed to a new contract with the new terms. In the Court's mind the analytical gap between the data used and the opinion offered is far too great to permit the opinion to be introduced. Picking this million dollar number is classic ipse dixit and would remain so even if Dr. Degnan were to now essay an expansion of his reconstruction of the market.

The hypothetical contract involved here is one that cannot exist without a contract term setting the price. Inasmuch as any hypothetical price for this hypothetical contract cannot be set other than by speculative, the contract itself is speculation

and all testimony about a hypothetical contract must be deemed inadmissible.

If the plaintiff were to argue that these are factual matters which must be left to the jury, the Court disagrees. Juries are told they cannot decide damages by speculation and they certainly cannot consider the issue when the only evidence presented to them is itself speculative.

ACCORDINGLY,

Dr. Degnan, the proffered expert witness, will not be allowed to testify as to the hypothetical existence or hypothetical terms of a contract between Medisystems and Fresenius as proffered by the plaintiff.

Additionally, the Court finds that sales of acceptable noninfringing substitute products cannot be the basis of legally compensable patent damages, and Dr. Degnan will not be allowed to testify as to any calculation or measure of patent infringement damages based upon any sale of the WingEater needle guard as it is an acceptable noninfringing substitute product.

IT IS SO ORDERED.